TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-05-00256-CR






Ray Recio Cortez, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 119TH JUDICIAL DISTRICT

NO. B-04-0897-S, HONORABLE BEN WOODWARD, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 Appellant Ray Recio Cortez entered a non-negotiated guilty plea to the first-degree
felony of aggravated kidnapping. (1) See Tex. Penal Code Ann. § 20.04 (West 2003). The district
court adjudged him guilty and imposed an eighty-year prison sentence. In two issues, appellant
challenges the factual sufficiency of the court's finding that he did not release complainant in a safe
place and argues that the court abused its discretion by sentencing him to eighty years' confinement. 
We affirm the district court's judgment.




BACKGROUND

 After being indicted by a grand jury for the first-degree felony of aggravated
kidnapping, appellant pled guilty and executed a stipulation of evidence in which he admitted that
he intentionally and knowingly abducted complainant by threatening to use deadly force. During
sentencing, the court heard testimony from several witnesses: the security supervisor for Wal-Mart
Supercenter in San Angelo, the complainant, the motorist who assisted complainant, a San Angelo
Police Department detective, and appellant's mother.

 Diego Castro, security supervisor for the Wal-Mart Supercenter in San Angelo,
testified that the store has a video-surveillance system, which includes security cameras positioned
toward the parking lot. He testified that he made a videotape recording of the event that occurred
on June 24, 2004, in the store's parking lot and gave it to detectives from the San Angelo Police
Department. The court admitted a copy of the videotape into evidence.

 When complainant took the stand, the court played the videotape, and she identified
the images of herself, her car, and appellant in the parking lot. She testified that she was a twenty-three-year-old college student who worked at Wal-Mart as a cashier and was shopping there on the
date of her abduction. She completed her shopping sometime after 6:00 p.m., returned to her car in
the parking lot, opened the driver's side door, and seated herself in the car when appellant confronted
her. As he got between complainant and the open car door, he told her that he had a gun and that
he would use it if she screamed. Complainant believed that appellant did have a gun because she
could see the outline of something when he patted near his waistband; she denied that he ever tried
to show her that he did not have a gun. Appellant told complainant that he wanted all her money,
and he forced his way into her car by pushing her to the passenger's seat. He then drove her car out
of the parking lot.

 Complainant stated that as they drove away, appellant asked for her purse and how
much money she had with her. When she informed him that she only had $20, he told her that they
were going to drive around until after dark and then they would go to an automatic teller machine
(ATM) to withdraw her money. Complainant recalled that her car was low on gas, but appellant did
not want to stop anywhere in San Angelo and risk having her seen by someone she knew. Appellant
began driving toward Mertzon, a town that was unfamiliar to complainant.

 Complainant stated that at one point, appellant drove the car off the highway and onto
a dirt road to search through her purse, but afterward, he returned to the highway and continued
driving toward Mertzon. Appellant asked her if there was anything wrong with her car because he
did not want to be "pulled over." He told her that if she tried "anything funny," he would drive to 
a field that was on the left side of the road and kill her. During cross-examination, complainant
confirmed her testimony about this threat, stating that although appellant said he would not harm her,
he had previously "pointed to a field and said he was going to shoot [her]."

 As they approached Mertzon, appellant asked complainant whether she had anything
that could be used to tie her to the car when he stopped for gas. He had her take a lanyard--a cord
worn around the neck that held complainant's school identification badge--that was hanging from
the car's rearview mirror and tie her right wrist across her body to the gear shift. Believing that she
had not tied the knot tightly enough, appellant tightened it. Complainant testified that her wrist was
tied so tightly that it began to cut off circulation to her hand.

 When they arrived in Mertzon, appellant stopped at a gas station and took the keys
from the ignition. Before paying for the gas with complainant's $20, he told her to "keep [her] eyes
on him at all times, otherwise he would come right out because [she] couldn't get very far from
him." Complainant described appellant's demeanor during the drive to Mertzon as "very
authoritative" and "very forceful," and she said she did not know what he was going to do to her. 
During the minute or two that appellant was inside paying for the gas, he was watching her.

 After paying for the gas, complainant recalled that appellant returned to the car and
started driving back to San Angelo. As he was driving, appellant untied complainant's wrist and
began conversing with her. He asked her questions about herself, asked her to look at him so that
she "would be able to identify him" whenever she got away, and told her that he had been to jail
before. He told complainant that he needed money for drugs and that she was "just in the wrong
place at the wrong time." Occasionally, he touched complainant's leg. Complainant testified that
she was scared and crying and thought he might kill her.

 It was almost dark when appellant and complainant arrived in San Angelo in search
of an ATM. While they were stopped at a red light, appellant made complainant kiss him because
she "looked too scared" and because people who saw her would think something was wrong. 
Appellant drove to a downtown bank where complainant attempted to withdraw money. When the
bank did not accept complainant's debit card, they continued on to San Angelo State Bank. Once
there, appellant leaned his seat back and had complainant crawl over him from the passenger side
to use the ATM. Complainant testified that as she did so, appellant put his hands inside her shorts,
over her underwear, and touched her buttocks. The ATM dispensed the $100 she had withdrawn,
and appellant took the money and the receipt from her hands.

 Appellant then drove to two houses in an attempt to purchase drugs. Complainant
recalled that the first was a house "behind the Grande Hotel on Chadbourne." He parked the car on
the side of the road against a tree so that complainant could not open the passenger's side door. Then
he exited the car and talked to some people while he stood next to the driver's side door. Getting
back in the car, he told complainant that they did not have what he needed. He drove to another
house "by 16th Street." Appellant parked the car with the passenger side facing a house that was
between twenty and fifty feet away. He got out of the car, walked a few steps to the house, and
talked to some people while he stood outside. They yelled something at him and asked his name as
he walked back to the car; he gave his name, got in the car, and "sped off."

 Complainant testified that after they left the second house, appellant asked whether
she had anything in the trunk of her car that could be used to tie her up. Appellant told her that "he
wasn't going to just let [her] go so he could be caught in fifteen minutes and go to jail." When asked
whether appellant told her that he was going to let her go after he had gotten his money and the
"dope," complainant stated that he told her "he was going to let [her] go, but it wasn't going to be
easy for anyone to find [her]." Complainant stated that she tried to think about how to get away from
appellant. She denied trusting him to release her in a safe manner.

 Meanwhile, appellant drove downtown to Martin Luther King Boulevard and stopped
at a bar, parking the car about ten feet from its door. Complainant saw him walk to the bar and talk
to some people at the door, with the door still open. Appellant returned to the car and told
complainant that "[they] were waiting on this guy because he was going to take [them] to where he
could get his drugs." Complainant said that appellant stood outside for another minute but then he
returned to the bar. He walked inside, and complainant saw the door close behind him. She denied
that the keys were in the car when he went into the bar.

 As soon as complainant saw the headlights of an approaching vehicle, she "jumped
out of the car and ran into the middle of the road," attempting "to get away" and thinking that
appellant might come after her. She testified that she was "not at all" familiar with this part of town. 
Crying and screaming, she got the attention of a passing motorist. Complainant stood in front of the
truck that pulled up and began banging on the window, saying that she "had been kidnapped and the
guy was right there at the bar." The driver said that she would follow complainant and told her to
run toward an alley. Complainant did so and found refuge at a house. The police went to the house,
and complainant accompanied them to the police station where she made a statement and identified
appellant from a set of photographs.

 The driver who assisted complainant also testified. Tonya Taylor was driving to
the Chicken Farm Art Center where she resided and worked, located on three-and-a-half acres across
the street from the bar. Taylor observed that complainant was running in the street without any
shoes and waving her arms high in the air. She testified that complainant kept looking over her
shoulder and was "sort of hysterical"--screaming and crying, banging on the truck's window, and
trying to get into the passenger door of the truck. Taylor testified that she did not roll down her
windows or open the door because she did not know the situation. She yelled to complainant,
through the truck's rolled-up window, directing her to go across the street to an alley. Taylor knew
the alley was a one-way driveway and thought she could follow complainant, placing the truck
between complainant and harm's way. Taylor stated that she saw someone watching from the porch
of the bar but no one followed her. Taylor saw complainant run across the street, onto the art center
property, and toward the residence of Taylor's supervisors. Taylor testified that the art center
property was pretty well-lit, but she also stated that when in this area, she was "always very cautious,
particularly with that bar area there."

 Detective Jaime Padron of the San Angelo Police Department testified about his
involvement in the investigation of complainant's abduction. He stated that after appellant's
photograph was released to the media, the Ballinger Police Department notified him that they were
detaining appellant. When Detective Padron took appellant into custody, appellant told him he had
one thing to say, "I did not have a gun and I did not hurt her." Detective Padron testified that, after
being arrested and advised of his rights, appellant gave a voluntary written statement to the police. 
The court admitted appellant's statement into evidence, in which appellant denied having a weapon,
tying up complainant, or touching her inappropriately. He further stated that on the day of the
offense, he needed money for drugs. He admitted that he tucked a water bottle into his clothing and
told complainant that it was a weapon. His statement also says that he repeatedly assured
complainant that he would not harm her.

 Irma Cortez, appellant's mother, testified that she was disabled, needed her son, and
did not want him to receive a long prison sentence because she thought she would not "be here much
longer." On cross-examination, Cortez admitted that appellant's drug problem had worsened, stating
"the drugs have gotten deeper."

 After accepting appellant's guilty plea and hearing the witnesses' testimony, the
court assessed punishment at eighty years' confinement in the Institutional Division of the
Texas Department of Criminal Justice. Appellant filed a motion for new trial, alleging that there was
insufficient evidence to support his conviction. The motion was overruled by operation of law, and
this appeal followed.

DISCUSSION

Factual sufficiency

 In his first issue, appellant argues that the evidence is factually insufficient to support
the court's finding that appellant did not release complainant in a safe place. During the punishment
phase of a trial for aggravated kidnapping, a defendant may raise the issue as to whether
he voluntarily released complainant in a safe place. Id. § 20.04(d) (West 2004); Ballard
v. State, 193 S.W.3d 916, 918 (Tex. Crim. App. 2006). If the defendant proves the issue in the
affirmative by a preponderance of the evidence, the punishment range for the offense decreases from
a first-degree felony to a second-degree felony. Tex. Penal Code Ann. § 20.04(c), (d); Ballard,
193 S.W.3d at 918.

 We question whether this issue is properly before us. At trial, appellant did not
raise the issue of whether he voluntarily released complainant in a safe place, nor did he offer
any evidence in support of that issue. The State did not have the burden to "disprove" whether
appellant voluntarily released complainant in a safe place; it was required only to introduce evidence
showing appellant's guilt and supporting the court's judgment of conviction. See Tex. Code Crim.
Proc. Ann. art. 1.15 (West 2005) (requiring State to introduce evidence of defendant's guilt when
defendant pleads guilty to felony offense). However, in the interest of justice, we will consider
appellant's first issue.

 In a factual sufficiency review, we view the evidence in a neutral light and ask
whether a fact finder was rationally justified in finding guilt beyond a reasonable doubt. See Watson
v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). Next, we determine whether the evidence
supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether
the verdict is against the great weight and preponderance of the conflicting evidence. Id. at 415. 
Unless we can conclude with some objective basis in the record that the great weight and
preponderance of the evidence contradicts the jury's verdict, we will not reverse a case on a factual
sufficiency challenge. Id. at 417.

 Appellant contends that the evidence that complainant was not released in a safe place
is too weak to support the trial court's finding and that evidence to the contrary is so strong as to
create a manifest injustice. He contends that, when he entered the bar, complainant was unrestrained
in her own car, which was parked in front of a well-lit tavern on a public street and near a well-lit
art center, and that he did not follow complainant after she exited the vehicle.

 We disagree with appellant's assertion that he voluntarily released complainant in a
safe place. The record does not show that appellant "voluntarily released" complainant; it shows
that complainant escaped from the car. Her escape from the car is not the equivalent of her being
released by appellant. See Ballard, 193 S.W.3d at 919 (favoring narrow definition of "voluntary
release," which excludes rescue or escape). Additionally, nothing in the record demonstrates
that appellant made complainant aware of her "release." To trigger the voluntary release provision
of section 20.04(d), the accused must have performed some overt and affirmative act informing
the victim that she has been fully released from captivity. Id. Moreover, a rational trier of fact could
have found that the location was not a "safe place." The record shows that appellant left complainant
without car keys, in front of a bar, at night and in an area of town that was not at all familiar to her. 
Taylor, who knew the area, testified that she was "always very cautious, particularly with
that bar area there."

 After considering all of the evidence in a neutral light, we conclude that the court's
refusal to find that appellant released complainant in a safe place is supported by factually sufficient
evidence. See id. We overrule his first issue.


Excessive sentence

 In his second and final issue, appellant asserts that the district court abused its
discretion in sentencing him to eighty years' confinement. He contends that the court refused to
consider his drug addiction as a mitigating factor for sentencing purposes and that this refusal was
based on the "false principle" that his addiction was a voluntary condition, not a disease.

 The court violates due process of law if it assesses a predetermined sentence,
arbitrarily refuses to consider the entire punishment range, or refuses to consider mitigating evidence
when determining punishment. See McClenan v. State, 661 S.W.2d 108, 110 (Tex. Crim. App.
1983), overruled on other grounds, De Leon v. Aguilar, 127 S.W.3d 1, 5 (Tex. Crim. App. 2004);
Buerger v. State, 60 S.W.3d 358, 364 (Tex. App.--Houston [14th Dist.] 2001, pet. ref'd); Cole
v. State, 931 S.W.2d 578, 579-80 (Tex. App.--Dallas 1995, pet. ref'd). When reviewing a trial
judge's determination of the appropriate punishment in any given case, we afford the trial judge a
great deal of discretion. Jackson v. State, 680 S.W.2d 809, 814 (Tex. Crim. App. 1984). Ordinarily,
a sentence that is within the proper range of punishment prescribed by the legislature will not be
disturbed on appeal. Id.; Nunez v. State, 565 S.W.2d 536, 538 (Tex. Crim. App. 1978).

 Appellant did not complain during sentencing or in his motion for new trial about the
court's statements concerning his drug use. His failure to object waived any error. See Tex. R. App.
P. 33.1; Cole, 931 S.W.2d at 580; Cole v. State, 757 S.W.2d 864, 866 (Tex. App.--Texarkana 1988,
pet. ref'd). Even if that issue had been preserved for our review, appellant's sentence did not exceed
the permissible range of punishment for his offense. Appellant pled guilty to the first-degree felony
of aggravated kidnapping. See Tex. Penal Code Ann. § 20.04. Under section 12.32(a) of the penal
code, the punishment for this offense is imprisonment for a term ranging from five to ninety-nine
years or life. See id. § 12.32(a) (West 2004). The assessed punishment of eighty years' confinement
is within the permissible range for appellant's first-degree felony. Consequently, we cannot say the
trial court abused its discretion. See Jackson, 680 S.W.2d at 814; Nunez, 565 S.W.2d at 538. We
overrule appellant's second issue.


CONCLUSION

 Having overruled both of appellant's issues, we affirm the district court's judgment.


________________________________________ W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed: May 30, 2007

Do Not Publish
1. At the same proceeding, appellant pled guilty to two other pending indictments, unrelated
to this case, involving theft from a person and forgery of a financial instrument. See Tex. Penal
Code Ann. §§ 31.03, 32.21 (West Supp. 2006).